Filed 7/28/22  In re Julius E. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re JULIUS E., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JESSICA E. et al.,<br><br>Defendants and Appellants. | F083982<br><br>(Super. Ct. No. 18CEJ300315-3)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Fresno County.  Todd Eilers, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant, Jessica E.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant, Jonathan E.

Daniel C. Cederborg, County Counsel, and Carlie M. Flaugher, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Jessica E. (mother) and Jonathan E. (father) appeal from the juvenile court's order terminating their parental rights as to their two-year-old son, Julius E. (Welf. & Inst. Code,[1] section 366.26). They argue the juvenile court erred by declining to apply the beneficial parent-child relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)). The parents appeal separately but each join in each other's arguments. Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Julius was born in October 2019 and placed in the neonatal intensive care unit where he received treatment for premature birth, low blood sugars, and low oxygen. It was reported that mother used marijuana throughout her pregnancy for pain management, nausea, and to increase her appetite. Father also admitted to using marijuana.

At the time of Julius's birth, mother was involved in another dependency proceeding pertaining to his teenage half siblings, Dylan P. and Chloe P. Those proceedings arose from an incident in October 2018 where father physically abused mother's then 16-year-old son, Dylan, for a period of three to four hours during which Dylan suffered physical injuries, including, but not limited to, hair pulled out and wounds and bruises on his right thigh and buttocks. Dylan reported father hit his legs, buttocks,

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Both parents request we take judicial notice of the opinions this court filed in their respective petitions for extraordinary writ following the denial of reunification services and setting a section 366.26 hearing. In mother's opening brief, she requested we take judicial notice of this court's opinion in *Jessica E. v. Fresno County Superior Court* (F082256). With his opening brief, father filed a separate request for us to take judicial notice of this court's opinion in *Jonathan E. v. Fresno County Superior Court* (F082242). On April 20, 2022, this court deferred ruling on father's separate request pending consideration of the appeal on the merits and granted leave to the department to file an informal response, noting that failure to file a response may be deemed agreement that the request be granted. The department indicated in its respondent's brief it did not object to judicial notice of the opinions filed in either case for the purpose of factual and procedural background and did not file a separate response to our order. We hereby grant both parents' requests.

2.

ribs and genitals with a leather belt, vacuum hose, and metal bat. He further disclosed father picked him up by his legs, pushed him against the wall, punched his ribs with a closed fist, and picked him up by pulling his hair. Dylan also stated father had physically abused him on several prior occasions. Mother was present during the October 2018 incident and made no attempt to stop it. After the incident, she showed no remorse for what happened, stating that Dylan was a "jerk" and got what he deserved. Dependency jurisdiction was taken over Dylan and his twin sister Chloe. Mother was ordered to participate in reunification services with Chloe but was denied reunification services with regard to Dylan pursuant to section 361.5, subdivision (b)(6). At the time of Julius's initial removal, mother's reunification services had been terminated as to Chloe and a section 366.26 hearing was set.

On November 1, 2019, the Fresno County Department of Social Services (department) took Julius into protective custody.

On November 20, 2019, Julius was ordered detained from the parents. The court ordered the parents to have supervised visits with Julius for a minimum of two one-hour visits per week.

A third amended dependency petition, filed January 15, 2020, alleged that Julius came within the juvenile court's jurisdiction under section 300, subdivisions (a) (serious physical harm), (b)(1) (failure to protect), and (j) (abuse of siblings). Specifically, it was alleged Julius was at risk of harm because of the physical abuse father perpetuated against Dylan, mother's failure to protect against such physical abuse, and the parents' marijuana abuse.

In the department's jurisdiction/disposition report dated January 15, 2020, the social worker reported that visits between the parents and Julius went well, as "the parents interact well with Julius and care for his needs." The social worker went on to state the parents had been observed to be affectionate toward Julius and equally tend to

him. However, father's rude and confrontational behavior toward staff and the care provider was noted to be a concern.

The report further stated Julius had been diagnosed with an inherited genetic disorder that affects the adrenal glands and their ability to produce necessary hormones requiring him to take three separate medications throughout the day.

The report also indicated the parents had begun participating in some voluntary services including substance abuse services and parenting classes. As of May 2020, they were both consistently testing negative for illicit substances.

At the jurisdiction hearing on July 17, 2020, the court found Julius was described by section 300, subdivisions (a), (b), and (j), finding all factual allegations true except for those alleging substance abuse and continued the matter for disposition. The court ordered the parents to undergo a risk assessment.

In November 2020, Tamika London, Ph.D., completed psychological risk assessments for the parents. She reported there was no evidence that either parent had the "ability to provide an emotional, physical, psychologically safe, and nurturing home environment" for Julius and they both continued to pose a "substantial risk" to Julius.

As of December 2, 2020, the parents had made some progress in child abuse intervention classes, and mother had attended some domestic violence classes. The parents continued to test negative for substances.

The department's recommendation for disposition was that Julius be adjudged a dependent of the court, mother be denied family reunification services under section 361.5, subdivision (b)(7) and (b)(10), father be denied reunification services under section 361.5, subdivision (b)(6), and a section 366.26 hearing be set.

At the contested disposition hearing on January 8, 2021, the juvenile court removed Julius from the parents' custody. Both parents were denied reunification services; mother under section 361.5, subdivision (b)(7) because she had been denied reunification services to Dylan and father under section 361.5, subdivision (b)(6) because

4.

of the severity of the physical abuse he inflicted on Dylan.  The court set a section 366.26 hearing and reduced visits to a minimum of two times per month for one hour.

Both parents filed petitions for extraordinary writ challenging the order setting a section 366.26 hearing in *Jessica E. v. Superior Court of Fresno County* (F082256) and *Jonathan E.* v. *Superior Court of Fresno County* (F082242).  This court denied both petitions finding the evidence was sufficient to support the courts dispositional findings and orders.

In June and July 2021, both parents filed separate section 388 petitions requesting the court return Julius to their care on family maintenance services or order family reunification services.  To their petitions, they attached several proofs of completion of various services, including substance abuse services, a parent partner support group, and the Nurturing Parent Program.  Additionally, father attached proof of completion of a 52-week child abuse intervention course, and mother attached proof of weekly counseling from October 2020 to January 2021.  The juvenile court summarily denied both petitions on the grounds it did not state new evidence or a change in circumstances, the proposed order did not promote Julius's best interest, and, additionally, that the "[i]ssues raised … have been litigated during two trials and an appeal."

The department's section 366.26 report dated May 3, 2021, indicated visits between the parents and Julius were in person until March 18, 2020, when they were switched to video visits due to the COVID-19 pandemic. In-person visits resumed September 11, 2020, but visits returned to video in November 2020.  The social worker reported that visits were "appropriate, as the biological parents have been consistent and appropriate during the visits."  It was further reported the parents were engaged with Julius and told him they loved him.  Julius was observed not to experience distress after visits and "transition[ed] well after the visits."

The social worker observed two video visits in April 2021 and reported the parents utilized the full hour and the visits were appropriate.  The social worker further reported

5.

the parents spoke to Julius at above his age level, and while they attempted to engage Julius, he would at times become preoccupied and play on his own. The social worker noted the visits appeared to be "friendly visits" rather than visits demonstrating a "significant parent-child relationship." The social worker observed that Julius did not pay attention to the parents, and the parents had to call him to gain his attention. Further, the parents did not appear to be able to identify Julius's facial cues to understand his needs or wants. Julius was not observed to show any emotion that resembled separation anxiety from the parents.

The report further indicated Julius was both "generally" and "specifically" adoptable. His physical health was described as good and his emotional development was described as healthy. Though he had a life-long medical condition, it was reported that "with proper medical treatment[,] ongoing support and monitoring, Julius can lead a normal life."

Julius's care provider wished to adopt him. She had had Julius in her care since he was four months old, had learned all of his medical needs, and was educating herself about parenting a bi-racial child and was "committed to support his cultural connection/heritage with unbiased care and love." She was reported to be able to meet Julius's physical, emotional, and psychological needs. She was open to postadoption contact with the parents as long as it was safe and appropriate.

The department filed an addendum report dated December 16, 2021, detailing in-person visits between the parents and Julius from November and December. The social worker made several observations about the interactions between the parents and Julius during the visits. The social worker reported that when mother pulled "fuzzies" from Julius's hair, he "whined a little and pulled away." Julius and the parents played with the air hockey table, causing Julius to smile. Julius smiled to the parents and ran towards them but stopped before reaching them to look at a bag of toys. When mother held her arms out toward Julius, Julius scooted backwards. The parents showed physical

6.

affection toward Julius. Julius appeared to enjoy playing with the parents but did not show distress when separating from them.

The department recommended adoption as the most appropriate permanent plan for Julius and that parental rights be terminated.

The contested section 366.26 hearing was conducted on January 5, 2022. Mother testified on her own behalf that Julius was removed at birth from the hospital and never came home with her. She only missed one visit due to being sick. She had asked for more visitation but was never given an answer. As visitation progressed, Julius became "a lot closer" to mother and he would go to her and they would play and interact together. Julius trusted mother to pick him up and they got along. They would play Hot Wheels together and there was a "definite bond" between Julius and mother and father. Mother stated she misses Julius when he is not around and she is attached to him. She sought to find toys and games to make him think and challenge him and his creativity. After visits, Julius "never wants to leave." He got "grabby" and wanted mother and father to go with him. At almost every visitation, the parents had to walk him to the car so he stays calm.

Mother further testified she and Julius suffer from the same genetic illness and she understood "a great deal of what he's going through." She could tell whether he had taken his midday medications on time and "know[s] the signs." She testified "[i]t would be great for him to be able to have somebody in his life that has the same thing, who knows what he is going through" and that she had a challenging childhood not having anyone around with the same condition. When she was younger, she wanted to know if what she was going through was normal. She further testified that she had nothing against Julius's foster parent but her having the condition herself gave her a different insight on what is needed to make sure he stays healthy. She stated "[t]here will be a bond there that is going to be very hard to break in that we both have this condition. We both are—will be able to lean on each other for support as to what is going on with ourselves. I'll be able to know what he is feeling when he gets sick, and be able to make

7.

sure he stays out of the hospital more—I'll know what needs to be done to take care of him." The condition does not impact her day-to-day ability to do basic things.

Mother also testified she had completed as many services as she could, was presently employed, and had stable housing. She did not feel there was anything that would impact her ability to provide care for Julius.

Father testified on his own behalf that he did not miss a single visit throughout the proceedings. At visitations, he and Julius would wander around and explore and play together. Julius was curious and looked to the parents to help him explore. Julius was happy and comfortable with the parents and when he was upset, he wanted to be with them. Father stated that Julius got fussy at times if he was having a headache which is part of his medical condition. Julius was able to be redirected at other times when he was getting into things he is not supposed to and is very intelligent. Father stated Julius did not want to leave visits, wanted to continue to spend time with mother and father, and was not happy to get into the car after visits. Father also testified he knew how to do Julius's medical procedures if he missed taking his medication, and mother was a good resource because she grew up with the condition.

Father testified he felt it would be better for Julius not to be adopted. Father was adopted and he knew what it felt like to not know who your parents are and not have them in your life and have questions you cannot get answers to. Father was never able to make contact with his biological family and had medical and family questions. He wanted Julius to know him and mother. Father had spoken to other adoptees and explained, "[w]e all have those questions. We all want to know what happened with our parents, who they are, what they were, and what our family history was. That's something that's just a natural question of what happens when you're adopted, and I want Julius to be able to have us in his life so he knows us, and so that he can talk to us and ask us questions and know who he is and where he came from."

8.

The department called the social worker in rebuttal. The social worker testified the parents had not progressed to unsupervised visits and he was unsure what the reasons were. He noted no concerns during the visits he observed and that visitation was overall positive. He did not observe Julius disliking to leave visits like mother testified to. When it came to goodbyes, Julius exhibited no distress. The social worker observed Julius run toward the parents at the outset of a visit, but stop short at some toys and looked down at the toys.

The social worker further testified that Julius called his foster parent "momma" and they had a parent-child bond. Julius had been with her since he was four months old. The social worker did not believe Julius would benefit from continuing a relationship with the parents and does not believe it would be detrimental to Julius for their parental rights to be terminated. He testified it did not appear Julius and mother had an emotional attachment.

The parents argued the beneficial parent-child relationship exception to terminating parental rights applied. The department noted it was not disagreeing that the parents maintained visitation, but argued they had not proven that terminating parental rights would be detrimental to Julius. Minor's counsel noted he was submitting on the recommendation in the report and did not see a legal basis to apply the exception.

The juvenile court began its ruling by stating it had read and considered the section 366.26 report and the addendum report but that it "would like to point out some specific sections that [the court] had been considering." The court noted the incident where Julius ran toward the parents then stopped short to look at the toys and that reports indicated Julius had held his arms out to the care provider after visits and did not experience distress when separating from the parents, Julius had become preoccupied during some visits, and the visits appeared to be more friendly rather than a significant parent-child relationship. The court went on to state it found the parents to be credible in their testimony. The court further stated it appreciated mother's perspective about having

9.

the same genetic condition as Julius and father's testimony regarding being an adoptee "and the questions that remain." The court noted it was "clear from the testimony of the parents that there is an emotional connection between the parents and the child."

The court found there was clear and convincing evidence Julius was adoptable. As for whether the beneficial parent-child relationship exception applied, the court first stated it found the parents regularly visited Julius. The court found as to the "second prong," which the court defined as "whether the relationship is that of a parent-child relationship and not a relationship of a friendship or visitor relationship," that the parents had not proven by a preponderance of the evidence they had a "parent-child relationship rather than a visitor or friendship relationship." The court noted that "[i]t's somewhat of a double-edged sword with a child of this age, right, because the parents want to bring in toys to give the child something to play with and to interact with the child. And as the Court has previously stated, it didn't appear that there was any inappropriate interaction with the parents and the child. However, it's a double-edged sword because then is the child going to the parents because of the toys that are being brought or is it because of the parental relationship? So this court is not—I'm not stating based specifically on the toys itself, but the Court is just making a comment in regards to that." The court went on to say it was relying on the overall evidence to come to its conclusion.

The court further stated that even if it were to conclude there was a parent-child relationship, it would nonetheless find the exception did not apply because the parents had not met by a preponderance of the evidence the "third prong"—that the relationship "outweighs the benefit of adoption to the point of great harm to the child." The court accordingly concluded the beneficial parent-child relationship exception did not apply.

The court ordered adoption as Julius's permanent plan and the parents' parental rights were terminated.

Both parents filed timely notices of appeal from the court's order.

10.

## I. Preliminary Legal Principles

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

The California Supreme Court has recently clarified in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) that there are three elements a parent has the burden to prove by a preponderance of the evidence to justify the application of the beneficial parent-child relationship exception: (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Id.* at pp. 632–633, 636–637.)

Also relevant to the parents' arguments on appeal, the *Caden C.* court discussed factors that were inappropriate to consider in determining whether the exception applies. First, when the court determines the third element, "the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s) [as n]othing that happens at the section 366.26 hearing allows the child to return to live with the parent." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) Second, a court's *sole* reliance on a parent's failure to ameliorate the issues which led to the dependency is inappropriate because at the time of a section 366.26 hearing, a court "all but presupposes

that the parent has not been successful in maintaining the reunification plan meant to address the problems leading to dependency." (*Caden C.*, at p. 637.)

## II. The Juvenile Court's Alleged Failures to Receive Information Regarding the Parents' Relationship with Julius and Make Explicit Findings on the Record

Mother makes several claims, to which father joins, that the juvenile court erred procedurally. She first contends the matter must be reversed and remanded because the court erred by failing to receive information from the department as to the quality of her relationship with Julius, citing *In re J.D.* (2021) 70 Cal.App.5th 833, 854 (*J.D.*). *J.D.* does not support mother's contention.

In *J.D.*, the appellate court considered the appellant parent's contention the court erred by declining to apply the beneficial parent-child relationship exception. The *J.D.* court remanded the matter because it could not "be certain the juvenile court did not consider" factors deemed improper by *Caden C.*, which was published while the appeal was pending. (*J.D.*, *supra*, 70 Cal.App.5th at p. 854.) In conducting its analysis, the appellate court observed the evidence showing the strong relationship between the appellant parent and the child was introduced by the parent rather than the agency, who "provided very little information in its prior reports during the case about the quality of [the parent's] relationship with [the child] or even the nature of her interactions with him during visitation." (*Id.* at p. 860.) The appellate court noted the agency's lack of information "was not appropriate and did a disservice to not just [the parent] and [the child] but also the juvenile court" and went on to detail the importance of the social worker and required reports to dependency proceedings. (*Ibid.*)

Notably, however, the *J.D.* court went on to state: "To be clear, it was not the agency's burden to disprove the existence of the beneficial relationship exception—the burden of proof on this issue was squarely on mother. [Citation.] Moreover, there is tension in the case law concerning the extent to which the agency must address facts pertinent to the beneficial relationship exception in the section 366.26 report itself. We

12.

express no opinion here about the adequacy of the agency's section 366.26 report. [Citations.] Our point here is that by the time the juvenile court scheduled the section 366.26 hearing, the agency's prior reports should already have provided objective, disinterested information about the quality of [the child's] attachment to [the parent], which would have assisted the court in evaluating the beneficial relationship exception when [the parent] asserted it." (*J.D.*, *supra*, 70 Cal.App.5th at p. 861.) The *J.D.* court *did not* reverse the order terminating parental rights for inadequacy of the department's reports; therefore, the case does not support mother's claim that reversal is required for this reason.

Further, *J.D.* appears to be factually distinguishable as the department here included detailed summaries of several of the parents' visits with Julius in the section 366.26 report and its addendum report. Mother does not specify, apart from *J.D.*, a legal basis for her argument that the department's reports were insufficient or how exactly they were lacking. Accordingly, we reject this claim.

Mother also argues the juvenile court erred by ruling without making explicit findings for each of the elements set forth in *Caden C.* Mother cites no authority, and we have found none, that the juvenile court, in finding the beneficial parent-child relationship exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception. (See *In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.) As the court stated in *A.L.*, "we infer from section 366.26, subdivision (c)(1)(D)—under which the juvenile court is required to 'state its reasons in writing or on the record' when it makes a finding that termination of parental rights *would be* detrimental to the child—that the court is not required to make findings when it concludes that parental rights termination *would not be* detrimental." (*Ibid.*) The *A.L.* court concluded "although a statement by the trial court of its findings (or reasons) for its decision is helpful in conducting appellate review, it was not a legal

13.

requirement in this instance." (*Ibid.*)  We do not find the juvenile court's ruling here to be insufficient.

Finally, mother requests a bonding study between she and Julius upon remand. Because we will not be remanding the matter for the reasons set forth in this opinion, mother's request is denied as moot.  However, to the extent that mother is arguing the court erred by failing to order a bonding study before ordering termination of parental rights, we reject this contention.  While *Caden C.* noted that trial courts should "seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony" (*Caden C.*, *supra*, 11 Cal.5th at p. 633, fn. 4), we do not read *Caden C.* as standing for the proposition that a trial court errs where it does not sua sponte order a bonding study.  There is no indication in the record, nor does mother assert, that she requested a bonding study below; thus, we find no error.

### III. The Juvenile Court's Decision Declining to Apply the Beneficial Parent-Child Relationship Exception

In addition to mother's procedural arguments, both parents argue the court erred by declining to apply the beneficial parent-child relationship exception to terminating parental rights.  We disagree.

We review the first two elements—whether the parents regularly and consistently visited and whether a beneficial relationship exists—for substantial evidence and the third element—whether "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home"—for abuse of discretion.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 636, 639–641.)  Under the substantial evidence standard of review, "a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.]  The determinations should 'be upheld if … supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Id.* at p. 640.)  "Review for

abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard.  A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)[3]

Here, the parties appear to agree that the first element—the parents regularly and consistently visited—was met; we agree with the parties and need not discuss this element any further.  As for the second element, the juvenile court found the parents had not met their burden in proving it, noting they appeared to be merely friendly visitors to Julius.  And as for the third element, the juvenile court stated that even if it had found the parents had met their burden to prove the second element, the court would not find the parents had met their burden to prove "the parental relationship outweighs the benefit of adoption to the point of great harm to the child."  We conclude the court's factual findings were supported by the evidence and its ultimate ruling was not an abuse of discretion.

We cannot say the court erred by finding the parents had not met their burden to prove the second element.  In determining the second element, the court may consider factors such as " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs,' " as well as "how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

Here, Julius was removed from the parents shortly after his birth and never lived with them.  While visits went well, Julius was reported to leave visits without distress and

---

**3**     The *Caden C.* court explained " 'there likely will be no practical difference in application of the two standards,' " but "[a]t its core, the hybrid standard we now endorse simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

15.

showed no signs of separation anxiety, and there was no evidence he appeared to miss the parents when he was not with them.  The reports and testimony indicated Julius appeared to enjoy spending time with the parents, but there were moments he seemed preoccupied with other activities.  While the interactions between Julius and the parents appeared to be mostly positive, based on the evidence presented, the court could reasonably infer Julius did not have a significant emotional attachment to the parents.  We acknowledge, as the juvenile court did, that mother had the same medical condition as Julius, and father was adopted at a young age and sought to be there for Julius to answer questions and offer support from the perspective of an adoptee.  While these factors weigh in the parents' favor, we cannot say they compelled the juvenile court to find there was a benefit to continuing the relationship, based on Julius's very young age and the consistent reports he transitioned from visits without issue.  (See *In re Travis C.* (2017) 13 Cal.App.5th 1219, 1225 [" 'The judgment will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed [the] other evidence.' "].)

We reject the parents' arguments that the juvenile court relied on improper factors in determining whether the exception applies.  First, the parents argue the juvenile court improperly relied on whether the parents filled a "parental role."  To support this contention, father cites *J.D.*, *supra*, 70 Cal.App.5th 833.  In his reply brief, he expands on his argument, asserting we should follow *In re L.A.-O.* (2021) 73 Cal.App.5th 197 (*L.A.-O.*) and *In re D.M.* (2021) 71 Cal.App.5th 261 (*D.M.*) to the extent they "reject use of a 'parental role' analysis in determining the applicability" of the beneficial parent-child relationship.  Father's reliance on these cases is misplaced.

In *J.D.*, in deciding the beneficial parent-child relationship exception did not apply, the juvenile court found the child and appellant parent had a positive relationship but that it did not " 'amount to [a] parental bond.' " (*J.D.*, *supra*, 70 Cal.App.5th at p. 851.)  *Caden C.* was published while the appeal was pending, and the appellate court

16.

noted that the *Caden C.* court "did not address whether, to satisfy the second element, the nature of a parent's relationship must be 'parental,' a descriptor the Supreme Court did not use and that, standing alone, is vague and unhelpful in this context." (*J.D.*, at p. 864.) Noting the *Caden C.* court "said only that the child must have a 'substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship,' " the *J.D.* court explained that it could not "be sure whether the juvenile court's determination that [the parent] did not occupy a 'parental' role encompassed factors that *Caden C.* deemed irrelevant" and as such, the court appears to have applied the wrong legal standard under *Caden C.* (*J.D.*, at pp. 864–865.) The *J.D.* court remanded the matter for a new section 366.26 hearing consistent with *Caden C.* (*J.D.*, at p. 870.)

The court in *L.A.-O.* considered the appellant parents' argument that *Caden C.* "overruled lower appellate court decisions holding that a parent asserting the parental-benefit exception must show that he or she occupies a 'parental role.' " (*L.A.-O.*, *supra*, 73 Cal.App.5th at pp. 201–202.) The appellate court declined to make such a sweeping holding but did conclude under the facts of that case, remand was necessary. In arriving at its conclusion, the appellate court discussed thoroughly how the term "parental role" was ambiguous and that it thought it was "better not to use the words 'parental role' at all." (*Id.* at p. 211.) The court noted a "parental role" was defined by case law as a "list of 'nots' ": "It is not merely frequent and loving contact; it is not merely pleasant visits; it is not being merely a friendly visitor; and it is not merely an emotional bond (as opposed to a significant, positive, emotional attachment)." (*Ibid.*) The court went on to note the list was "consistent with *Caden C.*" but lamented that it "tells us nothing about the mysterious X factor that will boost the parent up from being merely a friendly visitor into the requisite parental role." Rather, the guidance given by *Caden C.* was only that the "X factor … must result in a 'substantial, positive, emotional attachment.' " (*L.A.-O.*, at p. 211.) The *L.A.-O.* court noted the juvenile court's ruling was "terse" and that it only

stated the parents had " 'not acted in a parental role in a long time' " whereas the prospective adoptive parents had been. (*Ibid.*) The appellate court acknowledged the juvenile court "may have meant that the children had a substantial, positive, emotional attachment to the prospective adoptive parents but not to the parents" and "[t]hat would be legally correct." (*Ibid.*) The court went on, "However, from its reference to a long time, it seems to have meant that they were not capable of taking custody, or had not been good parents, or had not been providing necessary parental care," which "would be erroneous." (*L.A.-O.*, at p. 212.) The court remanded the matter for reconsideration in light of *Caden C.*

Similarly, in *D.M.*, the juvenile court concluded the exception did not apply, focusing on the appellant parent's failures to be involved with the children's medical needs and appointments and concluding his efforts "ha[d] not risen to the level of a parent." (*D.M.*, *supra*, 71 Cal.App.5th at p. 268.) The appellate court concluded the juvenile court's findings "that father did not act like a parent" without any discussion about the attachment between the parent and the child was not consistent with *Caden C.'s* prescription that the focus must not be on "a parent's ability to care for a child or some narrow view of what a parent-child relationship should look like," but rather "whether there is a substantial, positive emotional attachment between the parent and child." (*D.M.*, at pp. 270–271.)

Distilling the principles from the above cases, as well as *Caden C.*, we find the parents' blanket assertion that the court may not consider whether they occupied a "parental role" is a vast oversimplification. Rather, the case law cited by father establishes a juvenile court's determination that a parent does not occupy a "parental role" *may* be error if it considers certain attributes relevant only to whether the parent can take custody of the child and ignores the pertinent question of whether the child has a "significant, positive, emotional attachment" to the parent. Much of the problem lies within the ambiguity of the language used by the juvenile courts in these cases and we do

not disagree with the court in *L.A.-O.* that trial courts should use language as precise as possible when discussing its findings with regard to the application of the beneficial parent-child relationship exception. As the *Caden C.* court advises, at the stage of the section 366.26 hearing, the focus is not on attributes of the parents as custodial caretakers but on the child. (*Caden C.*, *supra*, 11 Cal.5th at pp. 632, 634.)

Here, the juvenile court found the parents did not have a "parent-child" relationship with Julius but rather had a "friendship or visitor relationship." While the juvenile court did not use the exact words from *Caden C.*—whether the child had a "significant, positive, emotional attachment," we note the court did have the benefit of the *Caden C.* opinion, as it was published six months before the section 366.26 hearing in the present case. (See *Wilson v. Sunshine Meat & Liquor Co.* (1983) 34 Cal.3d 554, 563 [we presume the trial court followed the law].) Reading the juvenile court's ruling as a whole, we find nothing that demonstrates to us that by defining the second element as whether the parents had a "parent-child relationship," the juvenile court was assessing whether the parents could take custody of Julius, or considering any other inappropriate factor set forth by *Caden C.* Rather, the court's focus appeared to be on the nature of the parents' and Julius's relationship. For example, the court pointing out the fact that Julius ran to the parents but stopped short at the toys at one of the visits tends to show the court was focused on Julius's reaction and relationship to the parents, not the parents' custodial attributes. By finding the parents had the relationship of a friendly visitor rather than a parent-child relationship, it necessarily found a substantial, positive, emotional attachment justifying the application of the exception did not exist. As the *L.A.-O.* court pointed out, the *Caden C.* ruling is not inconsistent with a finding that a "friendly visitor" relationship did not satisfy the second element of the exception. (*L.A.-O.*, *supra*, 73 Cal.App.5th at p. 211.)

Father, joined by mother, also contends the court improperly emphasized Julius's relationship with his caretaker. While the *Caden C.* court noted the juvenile court must

19.

not compare the parent's attributes as *custodial* caregiver relative to those of any potential adoptive parents, we do not read the *Caden C.* court's statement as precluding *any* consideration of a child's well-being in an adoptive home. To the contrary, the *Caden C.* court also explained that in determining the third element, courts must "determine … how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life…. [¶] … That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' " (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The *Caden C.* court also explained that in determining the third element of the exception, the "court must … determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance" the harm a child may experience from losing a relationship with his or her parent. (*Id.* at p. 640.)

The *Caden C.* court's comments lead us to conclude the juvenile court should avoid focusing on a parent's custodial attributes, but a child's well-being in an adoptive home should be contemplated as relevant to the ultimate question of whether the child would suffer detriment from the termination of parental rights.

We do not find error on this basis. Julius's ability to thrive in the care of his care provider was relevant to the question of whether Julius would suffer detriment should his relationship with the parents be terminated. There is no evidence the juvenile court, for example, clearly found a substantial, positive, emotional attachment but discarded such a finding solely because the parents could not take custody of Julius or because Julius had a stronger attachment to his care provider. Rather, in making its findings, the juvenile court appeared to consider Julius's relationship with his care provider appropriately—that he had been with her almost his whole life and was doing well in her care despite the fact

he was out of his parents care, factors that pertained to Julius's well-being rather than the parent's ability to take custody of him.

Father, joined by mother, also argues that "any reliance the juvenile court placed on the fact that the parents had, according to the court, made no progress toward alleviating the issues leading to the dependency, was error."[4] We find no evidence for father's assertion the juvenile court relied on such a consideration in the record, and father only cites the fact that the juvenile court denied the parents' section 388 petitions months prior to the section 366.26 hearing, which does not support his claim. Accordingly, we reject it.

Finally, in his reply brief, father notes that he and mother "did everything they could do to qualify" (unnecessary capitalization omitted) for the exception. Father states, "per any analysis under the current dependency/reunification framework, the parents' efforts to apply for the exception was virtually doomed from the onset" and because Julius never lived with the parents, forming a bond with him was "an almost insurmountable task." We do not disagree with father that in a case like this, where a child is removed as an infant and reunification services were denied because of risk of physical abuse, the application of the beneficial parent-child relationship exception is difficult to prove; but we note that father's comments do not advance a legal basis for us to reverse the juvenile court's order. We note the beneficial parent-child relationship exception exists for the benefit of the *child*, not the parents, and at the time of the section 366.26 hearing, the focus is on the stability and permanence for the child, not

---

**4** The *Caden C.* court advised that parents "need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan' [citation] to establish the exception." (*Caden C.*, *supra*, 11 Cal.5th at p. 637, fn. omitted.) We note that in so stating, the *Caden C.* court did not preclude a juvenile court from considering a parent's struggles in its beneficial relationship determination, just that they "are relevant only to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Caden C.*, *supra*, 11 Cal.5th at p. 638.)

reunification.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  While we acknowledge this was not an easy case, the juvenile court came to the decision it felt was correct within the dependency framework, and on review, we find no legal error.

## <u>DISPOSITION</u>

The juvenile court's January 5, 2022 order terminating parental rights is affirmed.


                                      DE SANTOS, J.

WE CONCUR:


PEÑA, ACTING P. J.


MEEHAN, J.